Helen Irene Rhodes v. Commissioner.
Rhodes v. Commissioner
Docket No. 1709.
United States Tax Court
1944 Tax Ct. Memo LEXIS 116; 3 T.C.M. (CCH) 963; T.C.M. (RIA) 44301; September 16, 1944
*116 Clem F. Storckman, Esq. and Robt. A. Lennertson, C.P.A., 1307 Washington Ave., St. Louis, Mo., for the petitioner. J. E. Marshall, Esq. and James J. Waters, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion This case involves a deficiency in petitioner's income tax for 1939 in the amount of $5,466.67. The principal question raised is whether petitioner realized a taxable gain on the disposition of all or a part of her shares of Fischer Meat Co. stock. Respondent determined that petitioner had additional or other income not disclosed by her return for 1939 in the amount of $37,474.44, with this explanatory paragraph in the deficiency notice: It is held that the sum of $59,000 paid to you in 1939 by Fischer Meat Company and Frederick F. Fischer in consideration of the surrender of your stock in Fischer Meat Company together with your right to a bequest of additional shares in the same corporation and the settlement of certain controversies between yourself, Frederick F. Fischer and Fischer Meat Company, constitutes taxable income within the meaning of section 22 (a) of the Internal Revenue Code. Deduction has been allowed for legal fees expended in the amount *117 of $8,650.00, and for the basis of the stock in the sum of $12,875.56. The facts, stipulated in part, are as follows: Findings of Fact Petitioner filed her Federal income tax return for the taxable year 1939 with the collector for the first district of Missouri at St. Louis, Missouri. Otto Frederick Fischer was the husband of Mary C. Fischer and the father of Frederick Francis Fischer, Helen Irene Fischer, who became by marriage Helen Irene Rhodes (the petitioner), and Gertrude Fischer, who by her first marriage became Gertrude De Donato and by her second marriage Gertrude Boerger. Helen M. De Donato is a daughter of Gertrude Boerger and a granddaughter of Otto Frederick Fischer. Fischer Meat Co. is a corporation organized under the laws of Missouri in 1900, succeeding Fischer Packing Co. established in 1895 by Otto Frederick Fischer. Fischer Meat Co. is engaged in the meat provision business, selling to hotels, restaurants, clubs, industrial cafeterias, and markets throughout the St. Louis area and elsewhere, with its principal place of business at 415 Delmar Boulevard, St. Louis, Missouri. It began business on October 26, 1900, with an authorized capitalization of $3,000, divided *118 into 30 shares of common stock of the par value of $100 per share. These shares were issued to and owned by the following individuals in the amounts here set opposite their names: Otto Frederick Fischer
28 shares
Frederick Francis Fischer
1 shares
Mary C. Fischer
1 shares
Total
30shares
On January 30, 1923, Otto Frederick Fischer gave three shares of his stock to Mary C. Fischer, his wife, three shares to Frederick Francis Fischer, two shares to Helen Irene Fischer and two shares to Gertrude Boerger. After these gifts were made, the 30 issued and outstanding shares of Fischer Meat Company were owned as follows: Otto Frederick Fischer
18 shares
Frederick Francis Fischer
4 shares
Mary C. Fischer
4 shares
Helen Irene Fischer
2 shares
Gertrude Boerger
2 shares
Total
30 shares
On February 5, 1923, the authorized capitalization of Fischer Meat Co., was increased from $3,000 to $225,000, divided into 2,250 shares of common stock of the par value of $100 per share; and on the same date, a stock dividend of 74 shares for each share held was declared and paid, and the issued and outstanding stock of Fischer Meat Co. was then held as follows: Otto Frederick Fischer
1,350 shares
Frederick Francis Fischer
300 shares
Mary C. Fischer
300 shares
Helen Irene Fischer
150 shares
Gertrude Boerger
150 shares
Total
2,250 shares
*119 Otto Frederick Fischer died testate at St. Louis on August 4, 1938, leaving as his survivors, his widow, Mary C. Fischer, his son, Frederick Francis Fischer, and his two daughters, Helen Irene Rhodes, and Gertrude Boerger, the latter of whom had transferred her 150 shares of Fischer Meat Co. stock to her daughter, Helen Marie De Donato. The will of Otto Frederick Fischer bequeathed his 1,350 shares of Fischer Meat Co. stock, as follows: To: Frederick Francis Fischer
1,000 shares
Mary C. Fischer
150 shares
Gertrude Boerger
100 shares
Helen Irene Rhodes
100 shares
The will further provided for specific money bequests of $5,000 each to three grandchildren of Otto Frederick Fischer; also bequeathed the residue of his estate to Frederick Francis Fischer and St. Louis Union Trust Co. to hold in trust as co-trustee. The co-trustees were directed by the will to hold one-half of the residue in trust for the benefit of the widow, Mary C. Fischer; to pay over and deliver, free from trust 7/15ths of the other one-half of the residue to Frederick Francis Fischer; to hold the remaining 8/15ths in trust for Helen Irene Rhodes and Gertrude Boerger, and upon the death of Helen Irene *120 Rhodes, to hold one-half of the property then constituting her such share in trust for the benefit of Hugh D. Rhodes, her husband. Other provisions of the will are immaterial to the issues. Frederick Francis Fischer was actively engaged in the conduct and management of the business of Fischer Meat Co. long prior to the year 1938; and during the taxable year 1939, he was president of the corporation. Petitioner saw her father's will for the first time the day of his burial; was hurt at its unfairness and a dispute arose with her brother, Frederick Francis Fischer, over the will. Frederick Francis Fischer will be referred to hereinafter as Frederick. Petitioner employed an attorney to institute such suits and to take such actions as he thought proper to obtain for her the then present value of her interest in her fathers' estate, and, if necessary, to contest the will; and she agreed to pay her counsel in addition to a $250 retainer, 15 percent of the amount recovered up to $50,000, plus 10 percent of any amount recovered above $50,000. Fischer also employed legal counsel. The Fischer Meat Co. became collaterally involved in the will controversy and it too employed the same counsel *121 employed by Frederick. Petitioner did not approve of the way Frederick was operating the business; and she made various complaints to him, through her attorney, as to the manner in which he was conducting it. On July 20, 1939, petitioner and Frederick and their counsel executed an agreement, reading in part as follows: "(c) WHEREAS, a claim has been asserted and controversy has arisen between Helen Irene Rhodes and Frederick Francis Fischer as to the validity of said will and the amount she is entitled to receive as an heir or legatee of her father in his estate, and Frederick Francis Fischer denies that she is entitled to receive as much as she claims, and denies her claim that said will is invalid, and as a result of said disagreement, controversy and dispute, the said Helen Irene Rhodes, for the purpose of establishing her claims, is about to file such suit or suits as might be necessary to test the validity or meaning of said will and to construe and test the validity of the trusts created thereunder, and Frederick Francis Fischer and the other legatees desire to avoid the filing of such suit or suits. "(d) THEREFORE, in order to compromise and settle said dispute and differences *122 and to avoid litigation and to enable the executors and trustees named in said will to carry out said will in accordance with its true tenor and effect, said Helen Irene Rhodes and Hugh D. Rhodes, her husband, and said Frederick Francis Fischer have made the following compromise and settlement and entered into the following agreement: "(1) Said Frederick Francis Fischer will purchase or secure a third party to purchase from Helen Irene Rhodes the One Hundred (100) shares of stock of the Fischer Meat Company bequeathed to her by the third paragraph of the will of Otto Frederick Fischer and he will also purchase or secure a third party to purchase from her One Hundred Fifty (150) shares of the capital stock of said meat company which she owned in her own right prior to and at the death of Otto Frederick Fischer, and in payment for said shares and as consideration for the settlement and compromise of the claims in dispute, and in particular, the recognition of the validity of the said will and the validity of the said trusts created thereunder, said Frederick Francis Fischer in his own behalf and on behalf of all the other legatees in the will of the said Otto Frederick Fischer, will *123 pay to Helen Irene Rhodes the sum of Fifty-Nine Thousand Dollars ($59,000.00). "(2) It is understood that all or any part of the money arising from the sale of said Two Hundred Fifty (250) shares of stock may be used to apply on the Fifty-Nine Thousand Dollars ($59,000.00) to be paid by Frederick Francis Fischer to Helen Irene Rhodes, as stated above, and such sum as may be allocated or paid on said consideration of Fifty-Nine Thousand Dollars ($59,000.00) shall be determined by Frederick Francis Fischer, but the amount arising from the sale of stock so allocated, paid or applied to the obligation of Fifty-Nine Thousand Dollars ($59,000.00) shall not be construed as adequate or inadequate as reflecting the real or actual value of said Two Hundred Fifty (250) shares, but the value of said stock shall not be affected by the amount allocated, but the amount so allocated and applied shall be received by the said Helen Irene Rhodes as full and complete payment for the said stock, and she releases and relinquishes all right, title and interest, both legal and equitable that she may have by reason of ownership of said stock and this stipulation may be set up as a bar forever in any suit, *124 legal or equitable, affecting any claim or claims of any nature whatsoever in or over said stock, and when the full sum of Fifty-Nine Thousand Dollars ($59,000.00) shall be paid (including the amount allocated and paid to Helen Irene Rhodes arising from the sale of the said Two Hundred Fifty (250) shares of stock), the entire consideration of this contract shall be deemed paid in full. "(3) It is understood that by the terms of the will of Otto Frederick Fischer, certain property is placed in trust with the trustee, to be held for the use and benefit of Helen Irene Rhodes and her husband, Hugh D. Rhodes, and it is agreed that this settlement shall not affect their rights or interest in and to said trust property but that notwithstanding this settlement, she shall be entitled to receive from said estate, and he shall be entitled to receive from said estate, and from the trustees thereof, all the income, rights, interest, benefits and privileges conferred upon her and upon him by said will, including the right of said Helen Irene Rhodes to withdraw from the principal of her trust share, the sum of One Hundred Dollars ($100.00) per month, and the right of the trustees to encroach, for *125 her benefit, upon the principal of said trust, all as provided in the ninth paragraph of said will. "(4) It is also understood that other trusts are created by said will, and it is agreed that all trusts shall be carried out in accordance with the provisions contained in said will and that the sum of money aforesaid received by Helen Irene Rhodes, the receipt of which she acknowledges, together with the payment of such sums as she may be entitled to receive from time to time under and by virtue of the terms of the trust or trusts in her favor, and the payment of such sums as her husband, Hugh D. Rhodes, may be entitled to receive from time to time under and by virtue of the terms of the trust or trusts in his favor, shall be accepted and taken by her and by him as full settlement of all her right, title and interest in and to said estate of Otto Frederick Fischer, and shall be accepted and taken by him as full settlement of all his right, title and interest in and to said estate of Otto Frederick Fischer, either flowing to him as a legatee or by or through the marital relation with Helen Irene Rhodes. "(5) For the consideration above stated, Helen Irene Rhodes and her husband, Hugh *126 D. Rhodes, agree not to bring any suit to contest the said last will and testament of the said Otto Frederick Fischer or to have the said will or trusts declared invalid by any court. * * * * *
"(8) It being the intention of all the parties hereto to determine fully all matters in dispute and recognize all the right, title and interest of each and everyone a party hereto, each of said parties does by these presents bind his or her heirs, administrators, executors and assigns, and it is further agreed that this stipulation shall be executed in triplicate and each copy thereof shall be an original." Other provisions fixed the interest of petitioner and her husband in the trusts to that received under her father's will, whether the trusts should continue or be set aside. Petitioner's attorney had a proxy from her, and as her proxy, attended the 1939 annual stockholders' meeting of Fischer Meat Co., and asked that it be continued in view of certain objections he had to holding the meeting at that time, and it was adjourned. The adjourned meeting was not held. One of Frederick's attorneys felt that a special meeting of the stockholders should be called, and all facts stated at the *127 special call. A special meeting of the stockholders was held on July 21, 1939, as will later more fully appear. But before this, petitioner's attorney had made demands of the attorneys for Frederick arising out of the dispute over the will, embracing (1) the amount of inheritance that petitioner should receive from her father, (2) the validity of the trusts provided for in the will, and (3) mismanagement of the Fischer Meat Co. Petitioner's grounds for believing there was mismanagement of the corporation were that the business had always been productive under the father; that Frederick, in the two years of his management, had suffered a loss in the meat business, although there was a small profit in the investment account; that he had borrowed from the corporation large sums of money, and that the father had left to the corporation about $65,000 of insurance which had been placed in the surplus account. Petitioner's attorney believed that there should be some check placed on this amount of money. Counsel for both parties discussed the advisability of a disgruntled stockholder getting out of the corporation as the best way to secure cooperation and harmony. Frederick had no money *128 available. The assets he had were tied up in investments which he could not immediately convert into cash without a loss. And petitioner's attorney proposed that the corporation purchase the two blocks of stock held by petitioner and pay for them out of surplus, charge it to surplus and capital account, and retire the stock. Immediately after the execution of the foregoing agreement, petitioner endorsed in blank and turned over to Frederick's attorney the certificate which she held in her own right for 150 shares of Fischer Meat Co. stock, and delivered it to him, obtaining a receipt therefor. At the same time, petitioner executed an assignment to her brother of the certificate for the 100 shares bequeathed to her under her father's will, and delivered it to his attorney. Fischer did not have the money to pay for these shares of stock. Petitioner was then paid $26,250 by check of Fischer Meat Co. to apply as a payment under the agreement. A second payment was made on July 21, 1939 by check of Fischer Meat Co. in the amount of $17,500, and petitioner signed a receipt, as follows: "St. Louis. Missouri July 21, 1939 "Received from Fischer Meat Company and Frederick Francis Fischer *129 the sum of Forty-Three Thousand Seven Hundred Fifty Dollars ($43,750.00), to be credited as part payment on contract dated July 20, 1939, between Helen Irene Rhodes and Frederick Francis Fischer and others; and in consideration of the payment so made, I, the undersigned, Helen Irene Rhodes, hereby release the Fischer Meat Company from any and all claims that have accrued or may accrue in relation to the ownership by me of two hundred fifty (250) shares of stock of said company and the management and conduct of said business. "(Signed) Helen Irene Rhodes" This aggregate $43,750 payment was a part of the $59,000 settlement referred to in the agreement of July 20 between petitioner and Frederick. A special meeting of the board of directors of the corporation was held on July 20, 1939, and the following action taken: "* * * It was unanimously agreed that the Company purchase the 150 shares of Fischer Meat stock held by Helen Irene Rhodes and the 100 shares bequeath [sic] to her, at the price of $175.00 per share. Said stock to be retired and surplus account charged with $75.00 per share, the excess over the par value. The following is a true copy of assignment given to the President *130 covering the 100 shares still held by the executors of the will of Fred Fischer, deceased. "I, Helen Irene Rhodes, do by these presents, in consideration of One Dollar ($1.00) this date paid and other valuable considerations, received by me, hereby assign, sell, set over, and convey to Frederick Francis Fischer the bequest of One Hundred (100) shares of common stock in the Fischer Meat Co., bequeathed to me under and by virtue of the will of my later father, Otto Frederick Fischer. "Helen Irene Rhodes." At this time there were only two directors, Frederick, and another holding one qualifying share. On July 21, 1939, the stockholders of the corporation, including petitioner, signed a waiver of notice of a special meeting of the stockholders to be held on the same day at 10:00 a.m. "for the purpose of considering a resolution, authorizing purchase of the outstanding stock in the name of Helen Irene Rhodes and those shares to which she is entitled under the will of Otto Frederick Fischer and the settlement of any and all claims between Helen Irene Rhodes and the Fischer Meat Co." Petitioner read the waiver and signed it. At the special meeting of the stockholders, called as aforesaid, *131 the following action was taken: "Whereas, the Board of Directors of the Fischer Meat Co. have heretofore compromised and settled all claims and controversies between Helen Irene Rhodes and the Fischer Meat Co. and have caused to be purchased her stock at the price of One Hundred Seventy-five Dollars ($175.00) per share and have paid the same from the surplus account and the 150 shares of stock owned by the said Helen Irene Rhodes have been surrendered and cancelled and the 100 shares bequeathed to her by her father, now held by the executors and trustees of his estate have been assigned to Frederick Francis Fischer as agent for the company to be surrendered to said company as soon as they are distributed by order of the Probate Court through the said executors and the price paid for said stock includes all claims of any nature whatsoever that the said Helen Irene Rhodes has, had or might have against the Company and in a complete discharge and settlement of the same; "Now, be it resolved, that the action of the Board of Directors and President of the Fischer Meat Co. be affirmed and ratified in all particulars as to the settlement of said claim of said Helen Irene Rhodes and the *132 purchase and cancellation of said stock, and said President is empowered and authorized to do any and all things necessary to further effectuate and carry out this settlement and compromise." All of the stockholders, except petitioner, attended this meeting. The balance of the $59,000 settlement, amounting to $15,250, was paid to petitioner by Frederick in November 1939. In the final settlement of the Estate of Otto Frederick Fischer, and on February 4, 1941, petitioner's bequest of 100 shares of Fischer Meat Co. stock under her father's will was delivered to Fischer. The certificates for the 150 shares and for the 100 shares of stock, as aforesaid, were delivered by Frederick to Fischer Meat Co.; and that for 150 shares was cancelled. Out of the $59,000 settlement, petitioner paid her attorney $8,650. The 1,350 shares of Fischer Meat Co. stock owned by Otto Frederick Fischer at the time of his death were valued for Federal estate tax purposes at $81 per share. The Fischer Meat Co. stock had a fair market value on March 1, 1913 of $3,674.08 a share, and of $86.50 on July 20, 1939 (after the increase in the number of shares above noted). Opinion KERN, Judge: The petitioner *133 disposed of her 250 shares of Fischer Meat Co. stock on July 20, 1939, 150 of which she had by gift from her father and the rest by inheritance from him in 1938; and by the same agreement with her brother by which she agreed to sell the stock, petitioner also agreed to waive all claims against the validity of her father's will, the total consideration to be paid her being $59,000. Respondent contends that petitioner sold (1) her claim for a larger share in her father's estate to her brother, Frederick, for $15,250; and sold to the Fischer Co. (2) her stock and her claims against that corporation for mismanagement by her brother for $43,750. He argues on brief that the $15,250 received by the petitioner from her brother constitutes income, citing Allen v. Welch, 49 Fed. Supp. 902; Charlotte B. Quigley, 1 T.C. 831; but in his reply brief apparently concedes the reasonableness of petitioner's claim that this much may not be income under the Supreme Court's ruling in Lyeth v. Hoey, 305 U.S. 188. He contends that $86.50 was the fair market value of Fischer Co. stock on the day of its disposal *134 by petitioner, July 20, 1939. There is no controversy here, for this valuation was that suggested by petitioner's own expert witness, and is accepted by petitioner. Respondent urges, however, that the fair market value of the stock received by gift was on March 1, 1913, $2,387.78, which is considerably lower than the estimate given by petitioner's witness. Respondent's argument then proceeds on the assumption that the $43,750 was paid petitioner by the corporation for both blocks of her stock and for her claims against the company; computes the price paid for the stock at $21,625 (based on the uncontroverted fair market value in 1939 of $86.50 the share), and treats the balance, $22,125, as received for petitioner's claims against the company for mismanagement. Respondent's theory is now revealed, and the rest of his calculation is mere computation of gain. He computes an ordinary gain of $8,199.44 on the sale of the 150 shares held by gift, which is reached by deducting respondent's computed fair market value in 1913, ($4,775.56 for the 2 shares then held by the donor which later by proliferation became the 150 held in 1939 by petitioner) from the total 1939 fair market value (at *135 $86.50 the share), or $12,975. Respondent next computes an ordinary gain of $550 on the 100 shares receved by inheritance in 1938, by deducting from the 1939 fair market value of $86.50 the share the acknowledged fair market value in 1938, of $81 the share. The treatment for tax purposes of the block of 150 shares he rests on section 115(c), Internal Revenue Code, pointing to the fact that the evidence shows a retirement of the stock purchased by the corporation in partial liquidation. Taking the gain on the stock sales (taxable at 100 percent under section 117, if respondent's theory of partial liquidation be accepted), respondent adds to this the $15,230 received from petitioner's brother in settlement of her claims against him, and the $22,125 computed as the gain on the compromise of her claims against the corporation, and finds ordinary taxable income of $46,104.44; with the resulting deficiency. The question here is like most questions involving human actions and human motives, not free from doubt, for seldom does man act on single and unmixed grounds. We must look for the dominant motive; and we must keep the whole course of acts before us to see the plan which lies back of *136 it. We have considered respondent's interpretation of the course of action disclosed by the evidence but we do not agree with this interpretation. 1. It is now settled law that what is received by an heir in compromise of his rights as such is as much his inheritance for tax purposes as what he receives under the will or by descent; and the exemption of section 22(b) 3, Revenue Act of 1938, applies. Lyeth v. Hoey, supra.Petitioner contends that the whole amount here received by petitioner, except the sale price of the 150 shares given her by her father, was by way of compromise of her claims as heiress, and respondent apparently concedes that what she received from her brother Frederick directly, or $15,230, under the agreement falls within the rule of that case; but contends that the remainder constituted a sale of stock to the corporation and a compromise of claims against the corporation. Obviously, petitioner's disposal of the 150 shares received by her as a gift during the lifetime of her father was not a part of her inheritance, and petitioner, as said, concedes so much. Petitioner would calculate the sale price of these shares at the accepted *137 fair market value of $86.50 the share, and deduct the total sale price from the total amount received, and concede the taxability of the gain on this sale at the difference between this amount and the fair market value in 1913, a point which we shall postpone discussing until the first issue is disposed of. We think that petitioner is right. The estate of petitioner's father consisted in part of the interest he held in a family meatpacking concern which he had created himself and which had grown with the years. He held 1350 shares at the time of his death, his wife and son, Frederick, 300 shares each, and petitioner and her married sister, 150 shares each of the total 2,250. By his will the father bequeathed to the son 1,000 shares, raising his interest to 1,300 shares, to the widow 150 shares, and to each daughter 100 shares, leaving petitioner as a minority stockholder with less than one-fifth the interest of her brother. Certain specific legacies to grandchildren followed. The residue of the estate was placed in trust, one-half subjected to a life estate in the widow, and the other half divided between the 3 children, 7/15ths to Frederick and 4/15ths each to the two daughters. *138 After the widow's death, 1/3 of the corpus would go to Frederick; and petitioner being childless, her own part, after her life estate and that of her husband should fall in, would also go to Frederick, or his issue. It is obvious, therefore, that Frederick received both in stock and under the trusts a disproportionately large share of the estate. Petitioner felt aggrieved by this distribution, threatened to contest the will, and retained counsel for the purpose. Frederick also retained counsel. As a result came the settlement agreement of July 20, 1939, all material parts of which are set out in our findings. It provided in substance that since petitioner was about to file suit to test the validity of the will, the agreement was entered into by Frederick on his own part and that of the other legatees by which he agreed to purchase "or secure a third party to purchase" petitioner's 250 shares of Fischer Meat Co. stock "and as consideration for the settlement and compromise of the claims in dispute, and in particular, the recognition of the validity of the said will and the validity of the said trusts", Frederick and the other legatees were to pay petitioner $59,000. No terms of payment *139 were stated, but it was "understood that all or any part of the money arising from the sale of said 250 shares of stock may be used to apply on the $59,000"; but no amount allocated to the stock purchase was to affect the adequacy of the payment for the shares, or to be taken as reflecting the real value of the shares. Petitioner on the signing of this agreement delivered to Frederick her certificate for 150 shares; and also an assignment of her interest in the undistributed bequest of 100 shares; and petitioner was paid $26,250 on the amount due. An allowance was made in the Probate Court for counsel's fees in settling the will contest. We come now to the corporate acts upon which respondent so strongly relies to show that the sale was to the corporation and part of the consideration was the compromise of petitioner's claims against it. It was well understood by all parties, apparently, that Frederick did not himself have the cash to complete the transaction and was going to fall back on the corporation as the "third party" to get it. It was well known to petitioner that he had been already borrowing heavily from the company, around $16,000, and that the company had $65,000 in cash *140 proceeds from the life insurance policy of the testator, their father. These facts constitute a strong reason which was urged by petitioner's attorneys for petitioner's procuring a settlement for cash, and the statement of them prepares one for the sequel of events. On July 21, the day after the agreement was executed, Frederick asked petitioner to sign a waiver of notice of a special meeting of stockholders of the company. She at first demurred on the ground that she was no longer a stockholder; but still being a shareholder of record as to the 150 shares, she at length consented and signed, but did not go to the meeting. The waiver spoke of purchase of the stock but said nothing of its retirement. It referred, however, to the "settlement of any and all claims between Helen Irene Rhodes and the Fischer Meat Company". Later in the same day, petitioner was paid $17,500. and she signed a receipt to the "Fischer Meat Company and Frederick Francis Fischer" for $43,750 "to be credited as part payment on contract dated July 20, 1939"; and she released Fischer Meat Co. "from any and all claims * * * in relation to the ownership * * * of 250 shares * * * and the management and conduct of *141 the business". After a partial distribution of the estate by the probate court in October, petitioner signed a receipt in November (undated) for the balance, $15,250, the receipt running to Frederick. And in 1941 the 100 shares were distributed to Frederick as assignee of petitioner. In the meantime, the company, according to its minutes, had held a special meeting of its board of directors on July 20 and had agreed to buy petitioner's 250 shares at $175 the share, "Said stock to be retired and surplus account charged with $75 per share, the excess over the par value;" and on July 21 the special meeting of the stockholders was held, which affirmed the action of the directors for "purchase and cancellation" of the 250 shares. At this time there were only two directors, Frederick and a nominal director holding only one qualifying share, no third director having been elected to succeed the trustee. We think that when all these circumstances are considered the obvious conclusion is that petitioner was dissatisfied with her father's will, threatened suit to set aside the will, and in her agreement with her brother Frederick of July 20, 1939 compromised all her claims against the will *142 and the testamentary trusts, and also sold 150 shares of her Fischer Meat Co. stock all for a total consideration of $59,000. She also parted, or course, with her right to receive the 100 shares left her by will, but the compromise cash settlement was in lieu of these shares and of that further portion of the estate to which she thought herself entitled but had not received under her father's dispositions. Except, therefore, for the 150 shares, the 1913 basis and sale price of which we shall hereafter determine, the petitioner received no income by the compromise, for what she got was in lieu of what she claimed by reason of her being an heir. Lyeth v. Hoey, supra.On this point we think it unnecessary to cite further authority. The validity of the compromise agreement here is not questioned and finally settled the differences between the heirs. It has apparently been treated by them as final, and we accept it as such. So much even the respondent concedes, for he would acknowledge that the payment made by Frederick on the day of settlement was by way of compromise; but at this point the corporation enters the scene. We think that it is clear that Frederick *143 from the beginning intended to raise the additional money necessary for the compromise settlement by resort to corporate funds. It was at all times a family corporation, and after the testator's death, practically a one-man corporation with Frederick at the helm as president, majority stockholder, and in effect, sole director. He had previously used, and it may be, abused that situation by obtaining large loans from the company without even corporate formalities, and petitioner's knowledge of this fact and her fear of trusting her interests longer with her brother and the corporation were potent factors in determining her choice to take her cash and go. Her counsel, it would seem on the somewhat uncertain evidence on this point, made something of this dissatisfaction in dealing with Frederick, and out of this arises the use of the word "claims" in the receipts and quittances to the corporation which she signed. But a satisfactory answer to all the doubts cast on her relations with the corporation will be found in the simple fact that 100 shares of the corporate stock was part of her prospective inheritance which she no longer wanted because of her brother's complete control of the *144 corporation. True, she had been a stockholder before her father's death, but her inheritance by increasing her interest in the corporation served also to increase her fears of its jeopardy. It can, on the whole, therefore, be said with more justice that she was a dissatisfied heir than, as respondent would picture her, a disgruntled stockholder. Nor do we find the corporate formalities of directors' and stockholders' meetings, which we must accept on the evidence of the minutes at their face value, any more convincing. Frederick merely used the corporation, as we see it, to raise the money, and even the acts of the corporation relate to the agreement of July 20, 1939 between petitioner and the heirs as the basic contract. Enough has been said, however, to demonstrate the reality of the situation: that petitioner compromised her inheritance under the will and that the other things done constituted merely the mechanics of carrying out the compromise. On what she got by the compromise she is not taxable. 2. What she got by the compromise must be determined by subtracting what she got for her undoubted sale of the 150 shares held by gift from her father inter vivos. Here the inconsistency *145 of the respondent's attack is revealed, for the supposed contract with the corporation fixed $175 a share as the selling price, but respondent, although asserting on the strength of this alleged contract the fact of the sale of all her shares, denies the actuality of the sale price. In this, consistently with the view we have just stated, we think he is right, The sale price must be taken to be whatever the fair market value of the 150 shares was on July 20, 1939. 3. This brings us to the last questions involved, the valuation of the 150 shares as of March 1, 1913, and July 20, 1939, and whether the difference between the two valuations is taxable in full. Only the petitioner introduced evidence concerning value. After a careful consideration of the record we conclude that the 1913 base of the 150 shares was $7,348.16. Respondent concedes and we hold that $86.50 per share was the fair market value of the stock on July 20, 1939, this being the figure testified to by petitioner's expert witness. The gain so found must be returned as ordinary income under section 115(c), Internal Revenue Code, as respondent contends; for the 150 stock certificate was marked as "cancelled", and was *146 intended to be retired by the corporation at the time of its acquisition. See Harold F. Hadley, 1 T.C. 496; Hill v. Commissioner, 126 Fed. (2d) 570. 4. In his reply brief respondent raises a question in regard to the attorneys' fees paid and previously allowed, and contends that only a proportional part should be allowed, if the $15,250 paid by Frederick to petitioner (and supposedly any other part also of the $59,000 which we may allow) as a part of petitioner's inheritance be held to be an inheritance. Putting aside any question of such fees having been paid for the conservation of property held for the production of income; see section 121(a), Revenue Act of 1942, made retroactive by subsection (e); we think the issue not timely raised and cannot be considered now. Decision will be entered under Rule 50.